ELMER NELSON, Ex'r and Adm'r of the Estate of Janet Strepek, Deceased, Plaintiff-Appellant, v. ROBERT THOMAS *et al.*, Defendants-Appellees (Rose Marie Strepek-Henning, as Special Adm'r of the Estate of Eugene E. Strepek, Deceased, Plaintiff; Robert Thomas *et al.*, Defendants).

First District (2nd Division)   No. 1—95—3319

Opinion filed July 23, 1996.

Dennis T. Schoen, P.C., of Chicago (Dennis T. Schoen, of counsel), for appellant.

Hinshaw & Culbertson, of Chicago (Steven M. Puiszis and Bruce L. Carmen, of counsel), for appellees John Keating and Village of Orland Park.

Segal, McCambridge, Singer & Mahoney, Ltd., of Chicago (Gregory E. Rogus and Jennifer L. Kelly, of counsel), for appellees Village of Tinley Park, Steven Vaccaro, and Mark Fabiszak.

Baal & O'Connor, of Chicago (Robert B. Baal and Laura M. Maul, of counsel), for appellees Village of Oak Forest and Charles Quinn.

JUSTICE BURKE delivered the opinion of the court:

Plaintiff Elmer Nelson appeals from an order of the circuit court granting summary judgment pursuant to section 2—1005 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2—1005 (West 1992)) to defendants, the Village of Orland Park (Orland Park), certain unknown police officers of Orland Park, Officer John Keating (Officer Keating), the Village of Tinley Park (Tinley Park), Officer Steven Vaccaro (Officer Vaccaro), Officer Mark Fabiszak (Officer Fabiszak), the Village of Oak Forest (Oak Forest), certain unknown police officers of Oak Forest, and Officer Charles Quinn (Officer Quinn). On appeal, plaintiff argues that summary judgment was erroneously granted because genuine issues of material fact existed as to whether the police officers' actions were a proximate cause of a collision that occurred when a criminal suspect ran a red light and collided with plaintiff's daughter and son-in-law's automobile, causing the couple's death, and whether the police officers' conduct during the police pursuit of the criminal suspect was wilful and wanton. For the reasons set forth below, we affirm.

On February 4, 1991, Robert Thomas (Thomas) was driving eastbound on 159th Street through Oak Forest in a Riviera fleeing

from police officers. At the same time, Janet and Eugene Strepek were driving southbound on Cicero Avenue at the intersection of 159th Street. Thomas ran a red light and collided with the Strepeks' car, which was properly in the intersection on a green light. The Strepeks died as a result of the collision.

For several weeks prior to February 4, 1991, there had been five "smash-and-grab" thefts committed in the Orland Park area. Some area police departments were informed during their roll call that the suspects of the five smash-and-grabs were a black male driver of a dark or gray Riviera, bearing an Indiana license plate with the number 45 L 4466, and a female who would run into the stores, grab the merchandise and then run to the waiting Riviera.

On February 4, 1991, when Orland Park police officer Keating ended his shift at 7 p.m., he gathered his belongings and got into his personal vehicle, a Bronco, and started to drive home. As he was driving home, Keating heard on the police radio in his Bronco that another smash-and-grab had occurred in the Orland Park mall. The radio dispatcher described two black females who ran into the mall, grabbed merchandise and then ran outside the mall to a waiting vehicle with an Indiana license plate bearing the beginning numbers of 45 L. Officer Keating immediately recognized the license plate number and suspects as the ones he had heard described during his roll call on the previous day.

After hearing the radio dispatch, Officer Keating saw a gray Riviera with a matching Indiana license plate traveling eastbound on 159th Street. He then called the Orland Park police to advise them of his observation. Keating also asked the Orland Park police to relay this information to the Tinley Park and Oak Forest police departments because the Riviera, on its present route, would travel through those two villages. According to Keating, he did not attempt to stop the Riviera, but continued to follow the suspect car, which was traveling under the speed limit, at a safe distance. Officer Vaccaro of the Tinley Park police department was driving behind Officer Keating and saw Keating's Bronco immediately behind the Riviera on 159th Street between 159th Street's intersections with Oak Park and Long Streets. Near the intersection of 159th Street and Long Avenue, Vaccaro advised Keating over the police radio that he was going to pull the Riviera over to the side of the road. Vaccaro then activated his squad car's emergency equipment and signaled the Riviera to pull off the road.

The driver of the Riviera complied with Officer Vaccaro's order and pulled to the side of 159th Street near a Kean gas station at the corner of 159th Street and Long Avenue. When the Riviera pulled off

the road, Officer Keating parked his Bronco at the gas station, exited his Bronco and walked toward the Riviera. At the same time, Officer Vaccaro exited his squad car and also began to walk towards the Riviera. Officer Busse of the Oak Forest police department stated that, while he was traveling in his squad car eastbound on 159th Street, he saw Vaccaro approach the driver's door of the Riviera and Keating approach the passenger's door. Officer Fabiszak, of the Tinley Park police force, also saw the two officers approach the Riviera. Approximately five seconds after Keating and Vaccaro began walking toward the Riviera, the Riviera quickly accelerated, drove away from the police and began traveling eastbound on 159th Street.

In response, Officers Keating and Vaccaro returned to their cars to follow the Riviera. At the same time, Oak Forest police cars were traveling westbound on the median of 159th Street toward the Kean gas station. While the Riviera was fleeing the police, the Riviera crossed over the median into the westbound lanes of traffic, swerved around the Oak Forest police cars in the median and crossed back into the eastbound lanes of 159th Street. Officer Quinn was one of the Oak Forest police officers situated in a squad car on the median. Officer Quinn stated in an affidavit:

"6. I then observed Orland Park and Tinley Park police squads with emergency equipment activated approximately two blocks behind the offender who appeared to be gaining distance on them.

7. The offender veered directly at my vehicle while it was on the median and then veered around my vehicle into the westbound lane of 159th Street and back into the eastbound lanes of 159th Street. After the Tinley Park and Orland Park police squads passed, I proceeded to turn eastbound onto 159th Street from the median where my car stalled. After I restarted the vehicle, I proceeded eastbound on 159th Street to Cicero Avenue where I observed an accident had already occurred. I did not witness the accident.

8. At no time was I in 'pursuit' of the offender nor did I exceed 45 mph."

When the Riviera swerved around Officer Quinn, he "clocked" the speed of the Riviera at 75 miles per hour. According to Officer Keating, at this point, other police cars had their emergency lights and sirens activated and were following the Riviera. Keating also stated that after the Riviera pulled away from the gas station, he lost sight of the car because he was not pursuing the vehicle. Keating further stated that upon hearing the events unfold, he was told over the police radio by his street supervisor not to get involved with stopping the Riviera.

Several officers stated in either depositions or affidavits that the

police were pursuing the Riviera as it drove away from the gas station on 159th Street. Officer Fabiszak stated that, in accordance with the Tinley Park police department's general orders, he was in pursuit of the Riviera. Also, Officer Vaccaro stated that the Riviera was fleeing to elude his squad car, as well as the other squad cars that were obviously in pursuit of it. Officer Busse also stated that the two Tinley Park units, as well as the Orland Park unit, were in fresh pursuit of the Riviera.

Meanwhile, at approximately 7:30 p.m., Janet Strepek picked up her husband, Eugene, from the Metra station in Oak Forest at the end of his work day, and they began to drive home on Cicero Avenue. When they came to the intersection of 159th Street and Cicero Avenue, they properly proceeded through the intersection because the traffic light was green. At the same moment, the Riviera, against the red light, sped through the intersection and collided with the Strepeks' car, killing the couple. The collision occurred approximately six blocks from where the Riviera had sped away from the police near the Kean gas station and happened less than a minute after the Riviera had sped away. Janet was 33 years old and survived by her father, Elmer Nelson. Eugene was 29 years old and survived by his mother, Rose Marie Strepek-Henning.

Officer Vaccaro described the Riviera's actions, from the time he pulled the car off the road to the time of the collision, as follows:

"6. The Riviera pulled over to a curb in front of a Kean gas station located at 5347 West 159th Street. I exited my car. I walked toward the Riviera and noticed Officer Fabiszak was pulling up behind me. Officer Keating was to my right and the marked Orland squad was behind me. The Riviera suddenly accelerated and fled the scene. I got back in my car and noticed the Riviera swerve around an Oak Forest squad car which was positioned near the median strip on 159th Street east of the Kean gas station.

7. I proceeded east, with my emergency lights and siren. I noticed other emergency vehicles behind me with their emergency equipment activated. The Riviera was in front of me gaining distance, traveling at a high rate of speed. I notified the Illinois State police of the Riviera's actions via ISPERN police radio.

8. The maximum speed I reached was 45 m.p.h.

9. As I approached 159th and Cicero, I observed the Riviera enter the intersection disobeying the red light and striking a grey vehicle heading south on Cicero, in the far west lane of traffic."

After the accident, the police found inside the Riviera the driver, Robert Thomas, also known as Donald Durkin, Renee Williams and Yolanda Jordan. Also in the Riviera were 16 pairs of blue jeans taken from J.C. Penney's, a number of coats taken from another store in the

Orland Park mall, and an open bottle of Wild Irish Rose wine. When Thomas was taken to the hospital for injuries he sustained from the accident, his urine tested positive for cocaine, quinine, quinidine, morphine and diphenhydramine.

All three occupants of the Riviera were charged with theft and murder. On September 28, 1992, Renee Williams pled guilty to the charge of theft and was sentenced to five years' imprisonment. In March 1992, Yolanda Jordan was convicted of murder and theft and was sentenced to natural life imprisonment. In July 1992, Thomas was convicted of murder, aggravated possession of a stolen motor vehicle and theft; he was sentenced to natural life imprisonment without the possibility of parole.

At her criminal trial, Yolanda Jordan testified that during the police chase she was scared, heard the sirens and saw the flashing lights from the squad cars, but she could not control Thomas and make him stop the car. Jordan also testified that she saw the red light at the intersection of 159th Street and Cicero Avenue and hollered for Thomas to stop, but that Thomas said, " 'Let the police worry about the red light.' "

On October 21, 1991, plaintiff Elmer Nelson, the father of Janet Strepek, filed a complaint as the executor and administrator of Janet's estate against Thomas. On January 31, 1992, Nelson filed an amended complaint which alleged 27 various counts against Orland Park, certain unknown police officers of Orland Park, Officer Keating, Oak Forest, certain unknown police officers of Oak Forest, Officer Quinn, Tinley Park, certain unknown police officers of Tinley Park, Officer Vaccaro, Officer Fabiszak, and Thomas. On February 3, 1992, plaintiff Rose Marie Strepek-Henning, Eugene Strepek's mother, as special administrator of Eugene's estate, filed a two-count complaint alleging a wrongful death claim against Thomas, Officer Keating, Officer Vaccaro, Officer Quinn, Orland Park, Officer Fabiszak, Tinley Park, and Oak Forest. On July 10, 1992, Strepek-Henning filed an amended complaint which alleged two causes of action based on wrongful death: one against Thomas and the other against Officers Keating, Vaccaro, Fabiszak and Quinn, Orland Park, Oak Forest and Tinley Park.

On October 9, 1992, Tinley Park, Officer Vaccaro, and Officer Fabiszak filed a motion to consolidate Strepek-Henning's lawsuit with Nelson's lawsuit. On October 28, 1992, the trial court granted the motion to consolidate for the purposes of discovery and motions only. On May 18 and May 24, 1993, the court granted defendants' motions for summary judgment on Rose-Marie Strepek-Henning's complaint based on its findings that Strepek-Henning did not have the legal

capacity to file her lawsuit because her son, Eugene, predeceased his wife, Janet. According to the trial court, Janet's estate had the legal right to file a lawsuit for Eugene's death, rather than Rose Marie Strepek-Henning. On June 22, 1993, Nelson moved to substitute as party plaintiff in the lawsuit filed by Strepek-Henning so that Janet's estate could recover for Eugene's death. On June 15, 1994, the court granted Nelson's motion to substitute himself as the party plaintiff for the estate of Eugene Strepek and consolidated the two cases.

On November 18, 1994, Orland Park, certain unknown police officers of Orland Park and Officer Keating filed a motion for summary judgment pursuant to section 2—1005 of the Code (735 ILCS 5/2—1005 (West 1992)). Attached to the motion for summary judgment were several exhibits, including the affidavit of Officer Keating. Defendants argued that no Orland Park police officer was the proximate cause of the Strepeks' deaths; no Orland Park police officer breached a duty owed to the decedents; no Orland Park police officer acted in a wilful or wanton manner; and that no basis existed for liability in failing to stop Thomas from violating the law.

On March 7, 1995, Tinley Park, Officer Vaccaro and Officer Fabiszak filed a motion for summary judgment pursuant to section 2—1005 of the Code (735 ILCS 5/2—1005 (West 1992)). They argued that no Tinley Park police officer acted in a wilful or wanton manner and that there was no proximate cause between the actions of any Tinley Park officer and the Strepeks' deaths.

On April 11, 1995, Oak Forest and Officer Quinn filed a motion for judgment on the pleadings pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 1992)). On the same day, Oak Forest and Officer Quinn moved for summary judgment pursuant to section 2—1005 of the Code (735 ILCS 2—1005 (West 1992)). In their motion for summary judgment, defendants argued that Officer Quinn did not act in a wilful or wanton manner because, after Thomas' Riviera swerved around Officer Quinn on the median, Officer Quinn's car stalled; thus, he could not follow Thomas. They further argued that once Officer Quinn restarted his car and began to drive, the collision had already occurred and that Officer Quinn's actions were not the proximate cause of the Strepeks' deaths.

On July 14, 1995, Nelson filed his response in opposition to defendants' motions for summary judgment. He argued that defendants' actions amounted to wilful and wanton conduct and that defendants were the proximate cause of Janet's and Eugene's deaths. Defendants filed replies to Nelson's response to their motions for summary judgment. Defendants argued that summary judgment was proper because there was no wilful and wanton behavior by the po-

lice officers since the officers did not act with a deliberate intention to harm or with an utter indifference to the safety of others. Defendants also argued that summary judgment was proper because the officers were not a proximate cause of the Strepeks' deaths.

On August 22, 1995, the trial court heard arguments on defendants' motions for summary judgment. Defendants agreed with each other that there were no genuine issues of material fact and that they relied on essentially the same case law which they argued routinely grants summary judgment to the defendant officers in cases similar to the one at bar.

Nelson argued that there were inconsistencies in the facts presented in the officers' affidavits and depositions and that those inconsistencies raised questions of fact that are proper for disposition by a jury. Nelson pointed the court's attention to Officer Keating's affidavit wherein he stated that he was not involved in the pursuit. Nelson argued that despite what Officer Keating stated in his affidavit, an eyewitness placed Officer Keating present and involved in the events of the pursuit. Nelson further argued that although Officer Keating was directly ordered to stay away from the pursuit by his street supervisor, he continued to remain involved in the pursuit.

Nelson also argued that it was inconsistent to have the police officers, on one hand, claim that they did not exceed the speed limit while they pursued the Riviera, which was undisputedly going between 70 and 75 miles per hour, and, on the other hand, have witnesses state that the officers were consistently one block behind the Riviera. Nelson also pointed to the fact that the officers continued pursuit of the Riviera knowing that there were residential dwellings, a grade school, and a Metra station next to 159th Street. Nelson further argued that the pursuit took place at the end of rush hour and the Riviera was always driving toward the intersection of 159th Street and Cicero, a major intersection of two four-lane highways. Nelson also directed the trial court to consider the general orders of each police department involved, orders which Nelson argued forbid a pursuit under the conditions presented in this case.

According to Nelson, the general orders for the Orland Park police department provide that there will be no vehicular pursuits over 65 miles per hour on a major highway or over 40 miles per hour in a residential area unless the officer has prior knowledge that the offenders have committed a forcible felony. The general orders for the Oak Forest police department provide that a "fresh pursuit" must be considered a very serious matter because it is one of the most dangerous duties that an officer performs. Oak Forest's orders further provide that death or permanent injury can occur without warning

to the officer and citizens alike and that a police officer must weigh many factors, including the civil liability, when deciding whether or not to pursue or continue pursuit. The Tinley Park police department's general orders are very similar to the Oak Forest general orders. Nelson therefore argued that, at a minimum, all these facts raised material issues of fact regarding whether the police officers' actions rose to the level of wilful and wanton conduct.

After hearing the parties' arguments on August 22, 1995, the trial court granted summary judgment to Officer Keating, certain unknown police officers of Orland Park, Orland Park, Tinley Park, certain unknown police officers of Tinley Park, Officer Vaccaro, Officer Fabiszak, Oak Forest, certain unknown police officers of Oak Forest and Officer Quinn. In making its ruling, the trial court stated, "We certainly have a tragic situation here where two innocent people were killed by a fleeing person who was under the influence of drugs and who is now in the penitentiary after being found guilty." The court also discussed the evidence presented by Officer Keating, and stated:

> "[C]ould that testimony be questioned? Yes. If that testimony is questioned, is the testimony of the other officers questioned? Yes.
>
> However, the bottom line in this case is the cause, the proximate cause, the sole proximate cause of this tragic situation of this accident, of the death of these two innocent people were not the actions of the police officers, but the actions of Mr. Thomas.
>
> This was only six to nine blocks. This wasn't a long police chase. This individual was fleeing the police and continued to flee for the six or nine blocks when the accident occurred. It was not the actions of the police officer[s].
>
> And as to Officer Quinn and Oak Forest, they were on the median strip sitting there, not moving and so, therefore the motion is granted to them on both issues. And as to the other officers, it's granted as to proximate cause."

The trial court further stated that in six or nine blocks of this police chase, Thomas would not have slowed down even if the police would have completely stopped. Lastly, the court stated, "[W]hether [the police] were going 40 or faster *** Thomas was the cause of the accident in the distance of six to nine blocks. *** My finding, as a matter of law, that the sole proximate cause of this accident was the actions of Mr. Thomas." The court then continued the matter with respect to Thomas.

On September 20, 1995, Nelson filed a notice of appeal from the August 22, 1995, order granting defendants' motions for summary judgment.

## I

Nelson first contends that the trial court erred in granting summary judgment because a genuine issue of material fact existed concerning whether the conduct of the police officers caused or contributed to the collision and resulting deaths of the Strepeks. He argues that the trial court erred when it held that, as a matter of law, Thomas was the sole proximate cause of the Strepeks' deaths. He also argues that the trial court's error is manifested by its deliberation on what Thomas' subjective reaction would have been if the police officers ceased pursuing him. According to Nelson, a judge may not draw a factual inference where conflicting inferences could be drawn. Nelson further argues that Thomas and the police officers are the cause of the collision because the police, in effect, "herded" Thomas into the intersection. In support of his argument, Nelson states that if the police ceased pursuing Thomas, he would have had no fear of apprehension and would not have entered a major intersection against a red light, risking injuries to himself and damage to his automobile. Additionally, Nelson argues that the determination of proximate cause is usually a factual determination made by the jury and that the issue should have been determined by a jury in this case.

Defendants argue that the trial court properly "centered" its ruling to grant summary judgment on its determination that Thomas was the proximate cause of the Strepeks' deaths because Thomas made the independent decision to run the red light at the intersection of 159th Street and Cicero Avenue. Defendants also argue that the trial court's decision is supported by sound public policy because if police officers were held liable in cases such as the instant case, criminals would flee police more dangerously knowing that the more precariously they drive, the less likely the officer will continue to pursue them due to the potential of civil liability. In effect, defendants argue, police pursuits would become more dangerous and cause more tragedy such as the result in this case.

■ Summary judgment is a drastic remedy. *Lappin v. Costello*, 232 Ill. App. 3d 1033, 1040, 598 N.E.2d 311 (1992). The standard of review is *de novo*, and a reviewing court determines whether the trial court correctly ruled that no genuine issue of material fact existed and that judgment was correct for the moving party as a matter of law. *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087, 1094, 651 N.E.2d 683 (1995). A reviewing court views the evidence in a light most favorable to the nonmovant and, if no facts are in dispute, the court may draw inferences. *Turner v. Roesner*, 193 Ill. App. 3d 482, 487, 549 N.E.2d 1287 (1990).

■ "[P]roximate cause is made up of two elements, actual cause and legal cause. Actual cause is cause in fact. A defendant's conduct may be deemed the actual cause of a plaintiff's injury if, 'but for' the defendant's actions, the injury would not have occurred. If actual cause is established, the next question is whether the defendant should be held legally responsible for it." *Kimber v. City of Warrenville*, 248 Ill. App. 3d 361, 367, 617 N.E.2d 1263 (1993); *Turner v. Roesner*, 193 Ill. App. 3d 482, 490, 549 N.E.2d 1287 (1990). "Illinois courts have long distinguished, however, between condition and causation." *Thompson v. County of Cook*, 154 Ill. 2d 374, 383, 609 N.E.2d 290 (1993). " 'The cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for causal agencies to act.' If a defendant's negligence does nothing more than furnish a condition by which injury is made possible, that negligence is not the proximate cause of injury." *Thompson*, 154 Ill. 2d at 383; quoting *Briske v. Village of Burnham*, 379 Ill. 193, 199, 39 N.E.2d 976 (1942); *Merlo v. Public Service Co.*, 381 Ill. 300, 306, 45 N.E.2d 665 (1942).

■ We find that the trial court properly granted defendants' motions for summary judgment because no genuine issue of material fact existed as to whether the police officers were the proximate cause of the Strepeks' deaths and, therefore, the judgment was proper as a matter of law. The evidence presented at the hearing on defendants' motions for summary judgment shows that Thomas continuously made independent decisions to commit criminal acts and that those decisions proximately caused the Strepeks' deaths. Thomas first committed a smash-and-grab theft with two females and then fled from police. Once stopped, he chose to flee from police at a high rate of speed for six blocks, to ignore a red light, and speed through the intersection of 159th Street and Cicero Avenue. Only Thomas' decisions and actions caused the collision with the Strepeks' car. The police officers' actions were, at most, a part of the "occasion" surrounding Thomas' actions, as they were responding to Thomas' crimes of theft and speeding away from the police. *Thompson*, 154 Ill. 2d at 383.

## II

Nelson next contends that the trial court erred in granting summary judgment because a genuine issue of material fact existed concerning whether the police officers' actions rose to the level of wilful and wanton conduct during the police chase. He argues that the evidence demonstrated that the police were wilful and wanton because they violated their own general orders in continuing the

pursuit and they continued to pursue a vehicle on a wet road toward a busy intersection at the end of rush hour. Nelson further argues that the issue of whether the actions of the police officers constituted wilful and wanton conduct was a question of fact to be determined by a jury.

In support of his "wilful and wanton conduct" argument, Nelson relies on *Kirshenbaum v. City of Chicago*, 43 Ill. App. 3d 529, 357 N.E.2d 571 (1976). In *Kirshenbaum*, the appellate court held that the trial court properly found that a police officer's actions rose to the level of wilful and wanton conduct during a police chase that resulted in a death because although the police officer had turned on his squad car's blue emergency lights, the police officer never used his siren during the chase. Instead, the police officer "only gave some 'short raps' on his horn." *Kirshenbaum*, 43 Ill. App. 3d at 531.

Defendants argue that Nelson's reliance on *Kirshenbaum* is misplaced because *Kirshenbaum* focuses on an Illinois statute pertaining to emergency vehicles using their sirens and a judicial determination as to when a failure for an emergency vehicle to sound its siren in a residential area amounts to wilful and wanton conduct. Here, defendants argue, it is undisputed that the officers used their emergency sirens and lights while pursuing Thomas' Riviera. Defendants also argue that the trial court properly held that their actions did not rise to the level of wilful and wanton conduct because they executed a police chase, at a safe speed and distance with their emergency lights and sirens activated, of a smash-and-grab suspect who fled from the police after being pulled off the road.

■ For a defendant's acts or omissions to be wilful and wanton, "they must have been committed with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others." *Breck v. Cortez*, 141 Ill. App. 3d 351, 360, 490 N.E.2d 88 (1986); *Harvey v. Norfolk & Western Ry. Co.*, 73 Ill. App. 3d 74, 390 N.E.2d 1384 (1979).

■ In the case at bar, the evidence shows that when the police officers originally pulled Thomas' Riviera to the side of the road at 159th Street and Long Avenue near the Kean gas station, they were intending to investigate a smash-and-grab suspect who had been recently described over the police radio and at a police roll call on the previous day. After the police had Thomas completely stopped off the road, Thomas sped away from the police, swerved around a police squad car into oncoming traffic and ran a red light. In reaction to Thomas' actions, the police followed him for six to nine blocks with emergency lights and sirens near the speed limit. We agree with the trial court that these police actions did not rise to the level of wilful

830

and wanton conduct. *Laco v. City of Chicago*, 154 Ill. App. 3d 498, 507 N.E.2d 64 (1987); *Breck*, 141 Ill. App. 3d at 360-61. Lastly, we also briefly note that notwithstanding the fact that the road was wet and the chase took place at the end of rush hour near a busy intersection, these facts do not demonstrate that the police officers acted with an utter indifference to or a conscious disregard for the public safety when reacting to Thomas' criminal acts. We therefore hold that the trial court correctly granted summary judgment because no genuine issue of material fact existed as to whether the police officers' actions rose to the level of wilful and wanton conduct, and judgment was proper as a matter of law.

For the foregoing reasons, we affirm the circuit court's order granting defendants' motions for summary judgment.

Affirmed.

SCARIANO and DiVITO, JJ., concur.